# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

AL F. WILSON,

       *Plaintiff,*

vs.

    Case No. 17-1287-EFM

TEXTRON AVIATION INC.,

       *Defendant.*

## MEMORANDUM AND ORDER

Plaintiff Al F. Wilson alleges that Textron discriminated and retaliated against him based on his race and disability. Before the Court is Defendant Textron Aviation Inc.'s ("Textron") Motion for Summary Judgment (Doc. 33). For the reasons below, the Court grants the motion.

### I.      Factual and Procedural Background[1]

One of Textron's predecessor companies hired Wilson on November 13, 1997, as a sheet metal assembler. From January 5, 2009, to May 21, 2012, Wilson was a final line assembler for another of Textron's predecessor companies. From May 21, 2012, to May 9, 2015, Wilson was a

---

[1] Textron set forth facts in his Motion for Summary Judgment, and Wilson failed to appropriately or adequately controvert Textron's facts that are relevant to this motion. Furthermore, Wilson set forth several additional facts in his response to Textron's motion that did not comply with Fed. R. Civ. P. 56 or D. Kan. Rule 56.1 standards, or were otherwise irrelevant to this motion.

sheet metal assembler at Textron, during which time Todd Meadows was his direct supervisor. Throughout the course of his employment at Textron and its predecessors, Wilson has only held the positions of sheet metal assembler and final line assembler. Since 2014, Textron no longer has the position of final line assembler, although it does have a similar position titled "assembly installer."

Throughout his employment with Textron, Wilson has been a member of a Union and is governed by its Collective Bargaining Agreement ("CBA"). Under the CBA, Wilson is entitled to a medical leave of absence of up to 12 months, during which he can receive medical and other benefits. If an employee seeks a transfer to another position (whether or not that employee is on leave), a transfer request is not granted unless (i) there are no laid off employees in the job classification involved who have recall rights, and (ii) there are no other transfer requests submitted by employees in the applicable employee subdivision with greater seniority rights who are currently or were previously in the job classification involved. Under the CBA, Textron can only consider transferring employees to positions which they have previously held. Because of these CBA seniority provisions, the only positions Textron could have considered transferring Wilson to in 2014, 2015, and 2016 were sheet metal assembler or assembly installer, since those were the only positions Wilson ever held.

The position of sheet metal assembler includes the following tasks: cleaning parts and work areas; assembling, sealing, drilling, sanding, and painting sheet metal; installing fasteners; bucking rivets; countersinking; using hand and power tools, and fitting jigs. All those tasks require frequent forceful handling, grasping, gripping, and hand manipulation. The similar position of assembly installer requires less frequent forceful gripping but more constant handling, grasping, and hand manipulation.

**A.     History of Wilson's Complaints and Textron's Evaluations**

Beginning in 2003, Wilson had problems with his hands, eventually resulting in surgery to correct carpal tunnel syndrome and subjecting him to permanent restrictions in his job duties. To meet these permanent restrictions, Textron rotated Wilson between tasks within his position. These task rotations effectively accommodated Wilson's disability for a time. However, beginning in the first quarter of 2014, Wilson complained about pain in his hands, wrists, and right shoulder. To address this pain, he began regularly visiting Textron's Health Services Department and a company doctor. In at least six separate instances from October 2014 to March 2015, Textron evaluated Wilson's medical issues and considered possible accommodations.

First, on October 24, 2014, representatives from Textron's Ergonomics and Environmental, Health, and Safety Departments evaluated Wilson's job duties to identify the risks of his position. Second, on November 10, 2014, representatives from Textron's Health Services and Ergonomics Departments, as well as Wilson's supervisor, Todd Meadows, conducted a job site visit to review the different tasks required in Wilson's position. During this visit, Textron's representatives gave Wilson a chance to describe what his job entailed. Textron's representatives informed Wilson that he could request a job transfer if he thought he was physically incapable of performing his current job.

Textron conducted a third evaluation on January 12, 2015, where Wilson completed a Functional Capacity Exam ("FCE") that identified permanent restrictions preventing him from reaching above his shoulders and limiting him to only occasional forceful grasping, fine hand manipulation, and simple grasping. These permanent restrictions were more severe than Wilson's prior restrictions from 2003. Members of Textron's Representatives met in February 2015 to

follow up on Wilson's FCE and new permanent restrictions. They agreed to conduct more job site visits to determine if his current position complied with his updated permanent restrictions.

Textron conducted a fourth evaluation on February 5, 2015, where its representatives, Meadows, a union steward, and the plant chair visited Wilson's job site to review the tasks required to work on the outboard composite doors and the inboard aluminum doors. Textron followed up with its fifth and sixth evaluations on February 9 and 11, 2015. During these visits, Textron's representatives evaluated Wilson's work on the speed-brake and left-hand inboard door.

After the six aforementioned evaluations and job-site visits, Textron's representative met on February 25, 2015, to evaluate Wilson's situation and permanent restriction, and consider potential accommodations. They determined that no reasonable accommodations could satisfy Wilson's heightened restrictions.

On March 2, 2015, Textron's representatives evaluated transferring Wilson to the only other available sheet metal assembler positions, ultimately determining that those positions also failed to comply with Wilson's restrictions. Textron therefore concluded that a job transfer was not a possible accommodation. On March 5, 2015, Textron's representatives evaluated Wilson's prior position on the upper-forward and center cowling assembly and determined that position was also not a match for his restrictions.

By early March 2015, Textron concluded that: (i) Wilson's existing position as sheet metal assembler did not comply with his permanent restrictions and that the only way Wilson could perform the essential functions of his existing position was to exceed his permanent restrictions; (ii) the work environment, manner, and circumstances in which Wilson's existing position was performed, and tasks required in it, could not be modified to allow him to perform the essential functions of that position while still complying with his permanent restrictions; (iii) there were no

-4-

other sheet metal assembler or assembly installer positions at Textron that were open and which complied with Wilson's existing permanent restrictions; and (iv) no sheet metal assembler or assembly installer positions at Textron would, even with reasonable accommodations, comply with Wilson's permanent restrictions.

Under Wilson's prior permanent restrictions from 2003, Textron was able to reasonably accommodate his disabilities through task rotation. However, Wilson's 2015 FCE established permanent restrictions that were more severe than before. After it completed its evaluation process, Textron concluded that task or job rotations would not comply with Wilson's permanent restrictions. In addition, Wilson's CBA limited Textron to transferring Wilson only to positions which he previously held. To comply with the CBA, Textron could only consider Wilson for the sheet metal assembler or assembly installer positions, since those are the only positions he ever held. Textron concluded that neither of these positions, with or without reasonable accommodations, would comply with Wilson's permanent restrictions. As a result, Textron determined that a medical leave of absence was the only reasonable accommodation for Wilson's permanent restrictions.

On March 9, 2015, Textron's representatives met with Wilson to review his permanent work restrictions and Textron's evaluation process. Textron advised Wilson that it could not accommodate his restrictions in his current position. Textron asked Wilson for his input on potential accommodations for his current position and he suggested that he should be transferred to his old position with the upper center and forward cowling assembly—which would also not comply with his FCE restrictions—or be put in charge of "the whole shop."

Following that meeting, Textron placed Wilson on a medical leave of absence. This decision was made collectively by individuals in Textron's Health Services, Human Resources,

and Labor Relations Departments, as well as Meadows. While on his medical leave of absence, Wilson did not advise Textron that his permanent restrictions had changed. No other positions became available during that period that complied with Wilson's permanent restrictions or CBA provisions. On March 14, 2016, Textron sent Wilson a letter informing him that he was two weeks away from the one-year anniversary of his medical leave of absence. Textron also inquired whether his medical condition had changed, in which case Textron would reengage in the interactive process to evaluate reasonable accommodations.

On April 22, 2016, Textron sent Wilson a follow-up letter requesting that Wilson sign and return a medical records release so that Textron could review his recent medical records and evaluate whether he could return to work. After Wilson provided his signed release, Textron had Wilson take a physical ability test to determine whether there had been a change in his permanent restrictions. In May 2016, Wilson took the test which identified no restrictions preventing him from returning to work. Wilson returned to work at Textron on May 23, 2016, in the position of sheet metal assembler.

**B.      Wilson's Calls to the Employee Hotline**

Textron has an Ethics and Compliance Hotline ("the Hotline") for employees to call to complain about work-related issues. The Network, Inc. ("TNI") operates the Hotline. When a Textron employee calls the Hotline, a TNI employee answers the call and speaks with the caller. Neither TNI nor Textron record calls to the Hotline. After the conclusion of a call, TNI creates a report for Textron. In 2014 and 2015, Jan Chapmon—then a Textron HR Manager—received TNI's Hotline reports.

On or about November 18, 2014, TNI provided Chapmon with a report of a call by Wilson to the Hotline on November 17 (the "Hotline Report"). TNI did not provide Chapmon with

information regarding any call by Wilson to the Hotline other than the Hotline Report detailing the call on November 17, 2014. The Hotline Report included the following information: Wilson had problems with his hand and had asked Meadows to move or rotate him to a new position, which Meadows refused to do; Wilson claimed to have made a prior call to the Hotline in October 2014; someone with Textron had a meeting with Wilson and Meadows on November 14, 2014; Wilson and Meadows had a later meeting with the Human Resources Department; and Wilson felt that "Meadows is upset with him because he called and made a report," that Meadows is "trying to think of reasons to criticize him," that "Meadows may be trying to drive him into quitting," and that "Meadows is retaliating against him." Chapmon also received a voicemail message from Wilson in late October or early November 2014, wherein Wilson made statements similar to those referenced in the Hotline Report as well as alleging Meadows's racial animus.

Upon receipt of the Hotline Report, Chapmon reviewed and investigated the allegations, interviewing Wilson, Meadows, and other Textron employees. Chapmon then drafted a final report to document the findings of her investigation, in which she concluded that several of Wilson's allegations from the Hotline Report were false. Namely, Meadows did not retaliate against Wilson. Chapmon's notes of her investigation into Wilson's call to the Hotline say nothing about racial discrimination or retaliation. She considered Wilson's complaints to be solely about his alleged disability discrimination.

## C. Procedural History

Wilson filed his first Charge of Discrimination against Textron with the Kansas Human Rights Commission ("KHRC") and the U.S. Equal Employment Opportunity Commission ("EEOC") on October 26, 2015. Wilson filed his second Charge of Discrimination against Textron with the KHRC and EEOC November 28, 2016. In those charges, Wilson alleged that Meadows

did the following: spent more time checking Wilson's work area for problems than he spent on other Caucasian employees, especially when Wilson was gone from work; wrote Wilson up for not keeping tool drawers clean when his drawers were just as clean as Caucasian employees who were not written up; routinely criticized Wilson for not being in the work area when the bell sounded, even though Wilson was in the area; held Wilson "to every letter of the book;" told Wilson he could not eat during meetings in the breakroom in 2012 or 2013; reprimanded Wilson for coming to meetings or work late in 2012 or 2013; embarrassed Wilson during a meeting with other employees; failed to accommodate Wilson or follow his doctor's recommendations when Meadows did so with other employees, including failing to rotate Wilson to a different job or task; and finally, Wilson alleged that Meadows falsified documents, gave him bad reviews, and wrote him up with bad reports in 2012 and 2013.

The EEOC issued Wilson a right-to-sue letter in February 2017. Wilson filed this case on November 15, 2017, asserting claims of race and disability discrimination and retaliation. Textron now moves for summary judgment on all of Wilson's claims.

## II.     Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[2]  A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[3]  The movant bears

---

[2] Fed. R. Civ. P. 56(c).

[3] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006).

the initial burden of proof and must show the lack of evidence on an essential element of the claim.[4]

The nonmovant must then bring forth specific facts showing a genuine issue for trial.[5] These facts

must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—

conclusory allegations alone cannot survive a motion for summary judgment.[6] The court views

all evidence and reasonable inferences in the light most favorable to the party opposing summary

judgment.[7]

### III.    Analysis

Wilson alleges that Textron discriminated and retaliated against him based on both his race

and disability. The Court will first address Wilson's race discrimination and retaliation claims,

and then address Wilson's ADA discrimination and retaliation claims.

### A.    Race Discrimination

Wilson has not presented direct evidence that Textron discriminated against him based on

his race. When a plaintiff has no direct evidence of race discrimination, his claim is subject to the

*McDonnell Douglas* burden-shifting analysis.[8] Racial discrimination claims brought under either

Title VII or § 1981 have the same elements.[9] As part of the *McDonnell Douglas* analysis, the

---

[4] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[5] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005).

[6] *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197 (10th Cir. 2000)(citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[7] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

[8] *Timmons v. AGC Flat Glass North America, Inc.*, 2015 WL 6511552, *6 (D. Kan. 2015) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1972)).

[9] *Id*. (citing *Randle v. City of Aurora*, 69 F.3d 441, 450 (10th Cir. 1995)).

plaintiff must first demonstrate a prima facie case of discrimination.[10] Then the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its decision.[11] Finally, the burden shifts back to the plaintiff to demonstrate that the defendant's reason is pretextual.[12]

    1.    *Prima Facie Case of Race Discrimination*

To establish a prima facie case of race discrimination, a plaintiff must show that (1) he belongs to a protected class, (2) he suffered an adverse employment action, and (3) the adverse employment action occurred under circumstances giving rise to an inference of discrimination.[13] Wilson is African-American and the parties do not dispute that he belongs to a protected class. The Court will thus consider whether Wilson has established the second and third elements of a prima facie case of discrimination.

The Court concludes that Wilson has shown he suffered an adverse employment action. An adverse employment action "must be materially adverse to the employee's job status."[14] Courts focus on the "materiality of the challenged action and the perspective of a reasonable person in the plaintiff's position" so as to "screen out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining . . . about discrimination."[15] A written warning, or reprimand, is an adverse employment action "only if it effects a significant change in the

---

[10] *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802); s*ee also Roberts v. Roadway Exp., Inc.*, 149 F.3d 1098, 1103, n. 1 (10th Cir. 1998); *Thomas v. Denny's, Inc.*, 111 F.3d 1506, 1513 (10th Cir. 1997).

[11] *Timmons*, 2015 WL 6511552 at *6 (citing *McDonnell Douglas*, 411 U.S. at 802).

[12] *Id.* (citing *McDonnell Douglas*, 411 U.S. at 804).

[13] *Luster v. Vilsack*, 667 F.3d 1089, 1095 (10th Cir. 2011).

[14] *Duncan v. Manager, Dep't of Safety, Denver*, 397 F.3d 1300, 1314 (10th Cir. 2005).

[15] *Boese v. Ft. Hays State U.*, 814 F. Supp. 2d 1138, 1145 (D, Kan, 2011), *aff'd* 462 Fed. App'x 797 (10th Cir. 2012).

plaintiff's employment status."[16]   A significant change in employment status includes hiring,

firing, failure to promote, reassignment with significantly different responsibilities, or a decision

causing a significant change in benefits.[17]   Inconveniences or annoyances that do not cause more

than de minimis harm to a plaintiff's job status are not actionable adverse actions.[18]   Moreover,

"increased tension and unpleasant relationships between employees are not considered actionable

adverse actions."[19]

The Court concludes that Wilson has failed to show that Meadows's actions were

"materially adverse employment actions."   Wilson alleges that Meadows scrutinized Wilson's

work more thoroughly than other employees' work, reprimanded Wilson for being late to

meetings, criticized the cleanliness of Wilson's work station, and made offhand comments that

embarrassed Wilson in front of others.   Wilson does not allege that Meadows threatened Wilson's

future employment prospects or current job status.   Nor does Wilson allege that Meadows ever

directly commented on his race or used racist language.   Absent more direct evidence, the

remaining evidentiary record does not indicate that Meadows's actions materially altered the status

of Wilson's employment.   While Meadows's actions may have been unprofessional or rude,

Wilson has failed to show that they were materially adverse employment actions.

On the other hand, Wilson argues—and Textron does not dispute—that Textron's decision

to place him on unpaid medical leave constituted an adverse employment action.   The Court agrees

---

[16] *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007).

[17] *Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir. 2007).

[18] *E.E.O.C. v. C.R. Eng., Inc.*, 644 F.3d 1028, 1040 (10th Cir. 2011).

[19] *Henderson v. Int'l Union*, 263 F. Supp. 2d 1245, 1284 (D. Kan. 2003).

that a year-long, unpaid medical leave of absence constitutes a materially adverse employment action, since it is, among other things, a decision causing a significant change in benefits. As such, Wilson has satisfied the second element of a prima facie case for racial discrimination.

However, the Court concludes that Wilson fails to establish the third element of a prima facie case of discrimination—that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. Wilson alleges that Meadows harbored racial animus against him and treated him differently from similarly situated employees by doing things like humiliating him during employee meetings. Wilson supports these assertions with testimony from coworkers characterizing Meadows's actions as discriminatory. Accepting these allegations as true for purposes of this motion, they may demonstrate that Meadows harbored racial animus against Wilson, affecting his decision to place Wilson on medical leave. However, Meadows was merely one member of the Textron team that decided to place Wilson on medical leave.

Wilson fails to allege facts showing that any of the remaining members of Textron's evaluation team also harbored racial animus against him. The team consisted of representatives from Textron's Ergonomics and Environmental Department, Health Department, Safety Department, and Human Resources Department. Wilson alleges no facts indicating that any of these other Textron representatives racially discriminated against him. The Court cannot therefore infer that anyone other than Meadows may have harbored racial animus against Wilson.

Furthermore, Wilson fails to show that Meadows influenced the remaining Textron representatives such that he co-opted the decision-making process. Meadows was not involved at every stage of the evaluation process. He did not lead the team during its final decision-making, nor is there any evidence that the team gave his opinions unequal weight. Wilson alleges that the other Textron representatives simply deferred to Meadows, letting him decide whether to task or

job rotate Wilson.  However, the undisputed evidence shows that the other representatives merely suggested that Meadows investigate such rotations.  They did not entirely defer the decision to him.  The other Textron representatives also considered the restrictions and accommodations themselves.[20]  Wilson therefore fails to show that Textron's adverse employment action occurred under circumstances giving rise to an inference of discrimination.

While Wilson has met the first two elements to establish a prima facie case for racial discrimination, he has failed to establish a prima facie case for the third element.  As such, the Court need not continue the *McDonnell Douglas* analysis and grants summary judgment on Wilson's race discrimination claim.

**B.    Race Retaliation**

Just like race discrimination claims, absent direct evidence of retaliation, race retaliation claims are analyzed under the *McDonnell Douglas* framework.[21]  The plaintiff must first demonstrate a prima facie case of retaliation.[22]  Then the burden shifts to the defendant to articulate a legitimate, nonretaliatory reason for its decision.[23]  Finally, the burden shifts back to the plaintiff to demonstrate that the defendant's reason is pretextual.[24]

---

[20] Notwithstanding these facts, no amount of job or task rotation would have satisfied Wilson's permanent restrictions under his 2015 FCE.

[21] *Davis v. Unified Sch. Dist. 500*, 750 F.3d 1168, 1170 (10th Cir. 2014).

[22] *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802); s*ee also Roberts,* 149 F.3d at 1103, n. 1; *Thomas*, 111 F.3d at 1513.

[23] *Timmons*, 2015 WL 6511552, *6 (citing *McDonnell Douglas*, 411 U.S. at 802).

[24] *Id.* (citing *McDonnell Douglas*, 411 U.S. at 804).

1.       *Prima Facie Case of Race Retaliation*

To establish a prima facie case of race retaliation, the plaintiff must show that (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) there is a causal connection between his protected activity and the adverse employment action.[25]   As previously explained, the Court concludes that Wilson has shown that he suffered an adverse employment action by Textron placing him on unpaid medical leave.   As a result, Wilson has established the second element of a prima facie case for race retaliation.   The Court will thus consider whether Wilson has established the first and third elements of a prima facie case of race retaliation.

The Court concludes that Wilson has shown that he engaged in a protected activity.   A protected activity for the purposes of race retaliation includes either (1) participating in or initiating a Title VII proceeding or (2) opposing discrimination made unlawful by Title VII.[26]   By submitting a race discrimination complaint to the Hotline, Wilson utilized the process Textron provides its employees to oppose race discrimination.   Textron disputes that the Hotline complaint contained specific information about racial animus since the record of the call does not indicate such statements.   But it is enough at this stage of the analysis to accept Wilson's sworn allegations to the KHRC that his earlier message to Chapmon contained complaints of racial animus.   Textron presents no clear evidence that the message left on Chapmon's phone did not mention race.   Rather, Textron infers from Chapmon's later report—which only mentioned disability complaints—that the message Wilson left on her personal phone simply reiterated his later claims of disability

---

[25] *Estate of Bassatt v. Sch. Dist. No. 1*, 775 F.3d 1233, 1238 (10th Cir. 2014).

[26] 42 U.S.C. § 2000e-3(a); *Jones v. Barnhart*, 215 F. Supp. 2d 1195, 1206 (D. Kan. 2002).

discrimination. Viewing the evidence in the light most favorable to Wilson, the Court concludes that he has sufficiently shown that he engaged in a protected activity.

However, the Court concludes that Wilson has failed to establish the third element of a prima facie case for race retaliation. Wilson fails to show a causal connection between his protected activity and the adverse employment action. To satisfy the causation element, a "plaintiff must show that the individual who took adverse action against him knew of the employee's protected activity."[27] A plaintiff can also show that the person allegedly harboring discriminatory animus (Meadows) used the person who effected the adverse action (Textron), "as a cat's paw to effect . . . her own biased designs."[28] Wilson fails to show either of these situations.

Even if the Court accepts Wilson's allegations that his Hotline call in November 2014 included claims of racial animus, TNI and Chapmon kept no record of such claims and concluded after an investigation that Wilson made no racial claims. As a result, the record given to Textron listed only Wilson's disability claims. Wilson has not alleged sufficient facts to show that anyone involved in the decision to place him on medical leave knew about his race complaints prior to that decision. Textron could not have retaliated against Wilson for racial discrimination claims of which it had no knowledge. Furthermore, as previously mentioned, Meadows was merely one member of the team that decided to place Wilson on medical leave. Wilson alleges no facts indicating that Meadows co-opted the team's decision-making such that his racial animus was the reason for the team's decision. As such, Wilson has failed to show a causal connection between

---

[27] *Williams v. Rice*, 983 F.2d 177, 181 (10th Cir. 1993).

[28] *Young v. Dillon Companies, Inc.*, 468 F.3d 1243, 1253 (10th Cir. 2006).

his protected activity and the adverse employment action and has therefore failed to establish a prima facie case of race retaliation under Title VII and § 1981.

The Court need not proceed with the *McDonnell Douglas* analysis since Wilson has failed to establish a prima facie case of race retaliation. As a result, the Court grants summary judgment as to Wilson's race retaliation claim.

## C. ADA Discrimination[29]

Wilson alleges that Textron discriminated against him on the basis of his disability by failing to reasonably accommodate his physical limitations. The ADA prohibits employers from discriminating against "a qualified individual on the basis of disability" by failing to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee."[30] Wilson has presented no direct evidence of Textron's disability discrimination. Similar to race discrimination claims, where there is no direct evidence of disability discrimination, the Court follows the *McDonnell Douglas* analysis.[31] The plaintiff must first establish a prima facie case of discrimination.[32] Then the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for the adverse employment

---

[29] The statute of limitations bars Wilson's disability discrimination and retaliation claims regarding events prior to December 30, 2014. The ADA requires that charges of disability discrimination/retaliation be filed within 300 days of the alleged discrimination/retaliation. *Kidwell v. Bd. of Cty. Comm'rs of Shawnee Cty.*, 40 F. Supp. 2d 1201, 1214-15 (D. Kan. 1998). Wilson filed his first Charge of Discrimination on October 26, 2015. Three hundred days before October 26, 2015, is December 30, 2014.

[30] 42 U.S.C. § 12112(a), (b)(5)(A).

[31] *C.R. Eng., Inc.*, 644 F.3d at 1037–38.

[32] *Id.*

action.[33]  Finally, the plaintiff bears the final burden of showing that the defendant's proffered reason is pretextual.[34]

    *1.     Prima Facie Case of ADA Discrimination*

    To establish a prima facie case of discrimination under the ADA, a plaintiff must present evidence that (1) he is disabled within the meaning of the ADA; (2) he is qualified to perform the essential functions of his job with or without accommodations; and (3) he suffered discrimination by the defendant because of that disability.[35]  For purposes of this motion, the parties do not dispute that Wilson was disabled within the meaning of the ADA.  The Court will thus consider whether Wilson has established the second and third elements of a prima facie case of disability discrimination.

    The Court concludes that Wilson was not qualified to perform the essential functions of his job with or without accommodations.  Under the ADA, reasonable accommodations include: (A) making existing facilities readily accessible to and usable by individuals with disabilities; and (B) job restructuring, modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, and other similar accommodations.[36]  A reasonable accommodation is a modification or adjustment to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enables a

---

    [33] *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1141 (10th Cir. 2011) (citing *McDonnell Douglas*, 411 U.S. at 802).

    [34] *See id.* (citing *McDonnell Douglas*, 411 U.S. at 804).

    [35] *C.R. Eng. Inc.*, 644 F.3d at 1037–38.

    [36] 42 U.S.C. § 12111(9)(A)–(B).

disabled individual to perform the essential functions of that job.[37]  However, an employer is not required to implement an accommodation that requires "undue hardship" after consideration of cost, financial resources, and other business operations.[38]  Among other things, an employer is not required to reallocate job duties to change the essential functions of a job, make other employees work harder or longer hours, promote the employee, reassign the employee to an occupied position, or create a new position.[39]  Similarly, an employer is not required under the ADA to accommodate an employee's disability by eliminating an essential function of his job.[40]

Wilson's permanent restrictions prohibited him from performing the essential functions of his job, with or without accommodation.  Textron's representatives determined that task-rotating Wilson would not accommodate his restrictions since every task within his job category exceeded his restrictions.  They further concluded that they could not move him to his prior position since that also consisted of tasks which exceeded his restrictions.  Finally, Wilson's CBA limited Textron to transferring Wilson only to positions which he previously held.   Therefore, Textron could only consider Wilson for the sheet metal assembler or assembly installer positions, since those are the only positions he ever held.  Textron concluded that neither of these positions, with or without reasonable accommodations, would comply with Wilson's permanent restrictions.  Textron's investigation concluded that the only way Wilson could perform the essential functions of his job was to exceed his permanent restrictions.  Therefore, Wilson could not perform the

---

[37] 29 C.F.R. § 1630.2(o)(ii).

[38] 29 C.F.R. § 1630.2(p).

[39] *Barnard v. ADM Milling Co.*, 987 F. Supp. 1337, 1343 (D. Kan. 1997).

[40] *McClurg v. GTECH Corp.*, 61 F. Supp. 2d 1150, 1161 (D. Kan. 1999).

essential functions of his job with or without reasonable accommodations. The Court concludes that Wilson has failed to establish the second element of a prima face case for disability discrimination.

Wilson has also failed to establish the third element of a prima facie case for disability discrimination: he has failed to show that he suffered discrimination by Textron because of his disability. Wilson alleges that Textron discriminated against him by failing to reasonably accommodate his physical limitations. To prevail on a failure-to-accommodate claim under the ADA, a plaintiff must demonstrate that: (1) he is disabled; (2) he is "otherwise qualified"; and (3) he requested a reasonable accommodation.[41] Federal regulations envision an interactive process between the employer and employee in order to create a reasonable accommodation.[42] To reiterate, the parties do not dispute that Wilson is disabled. Nor do they dispute that he requested a reasonable accommodation. However, Textron argues that Wilson is not otherwise qualified to perform the essential functions of his job, with or without a reasonable accommodation.

Textron engaged in good faith in the interactive process and determined that no reasonable accommodations would enable Wilson to perform the essential functions of his job. Textron's representatives held multiple meetings, evaluations, and job site visits from October 2014 to March 2015 to evaluate Wilson's existing job and its essential functions, compared those job requirements to his permanent restrictions, and analyzed whether those job duties could be modified or accommodated to comply with his permanent restrictions. Additionally, they searched for other

---

[41] *Sanchez v. Vilsack*, 695 F.3d 1174, 1177 (10th Cir. 2012).

[42] *Bartee v. Michelin N. Am., Inc*., 374 F.3d 906, 916 (10th Cir. 2004) (quoting *Templeton v. Neodata Servs., Inc.*, 162 F.3d 617, 619 (10th Cir. 1998)).

open positions within Wilson's classification—as required by his CBA—for which he was qualified and that complied with his restrictions. At the end of the process, Textron concluded that Wilson's existing position did not comply with his permanent restrictions and that the tasks required of his position could not be modified to comply with his restrictions. They further concluded that there were no other open positions that complied with Wilson's restrictions and CBA. Only after these making these determinations did Textron conclude that medical leave was the only reasonable accommodation for Wilson's disability. Therefore, Wilson has failed to show that he was "otherwise qualified" to perform the essential functions of his job.

The Court therefore concludes that Wilson has failed to establish a prima facie case of disability discrimination. As such, the Court need not analyze the remaining prongs of the *McDonnell Douglas* analysis.[43] The Court grants summary judgment as to Wilson's disability discrimination claim.

**D.    ADA Retaliation**

Lastly, Wilson alleges that Textron retaliated against him in violation of the ADA. The ADA states that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter . . . ."[44] Just like race retaliation claims, absent direct evidence of retaliation, disability retaliation claims are analyzed under the *McDonnell*

---

[43] Even if Wilson had established a prima facie case, the Court concludes that Textron has sufficiently shown that it had nondiscriminatory reasons for placing Wilson on medical leave. On at least six separate occasions over five months, Textron thoroughly evaluated Wilson's physical disability and considered accommodations. After this process, Textron's team met multiple times to discuss Wilson's situation, concluding that the only accommodation that met Wilson's restrictions was medical leave. Wilson presents no evidence that these reasons are pretextual.

[44] 42 U.S.C. § 12203(a).

*Douglas* framework.[45]  Under this familiar framework, the plaintiff must first establish a prima facie case of retaliation.[46]  The burden then shifts to the defendant to articulate some legitimate, non-retaliatory reason for the adverse employment action.[47]  The plaintiff then bears the ultimate burden of showing that the defendant's proffered reason is pretextual.[48]

### 1. *Prima Facie Case of ADA Retaliation*

To establish a prima facie case of ADA retaliation, the plaintiff must prove that (1) he engaged in a protected activity; (2) he was subjected to an adverse employment action subsequent to or contemporaneous with that protected activity; and (3) there was a causal connection between the protected activity and the adverse employment action.[49]

The Court concludes that Wilson has plausibly alleged that he engaged in a protected activity.  Wilson called the Hotline in November 2014 to complain that he was discriminated against due to his disability.  The parties do not contest that this complaint constitutes a protected activity under the ADA, and the Court agrees.

Wilson has also shown that he was subjected to an adverse employment action subsequent to or contemporaneous with his protected activity.  As previously mentioned, Wilson's allegations regarding Meadows's actions against him do not rise to the level of adverse employment actions because they did not materially change his employment conditions.  However, Textron's decision

---

[45] *Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1186 (10th Cir. 2016).

[46] *Id.*; *C.R. Eng. Inc.*, 644 F.3d at 1037–38.

[47] *Carter*, 662 F.3d at 1141 (citing *McDonnell Douglas*, 411 U.S. at 802).

[48] *See id.* (citing *McDonnell Douglas*, 411 U.S. at 804).

[49] *Foster*, 830 F.3d at 1186–87.

to place Wilson on unpaid medical leave in 2015 was an adverse employment action. Textron does not contest this. Since the adverse employment action occurred after Wilson's 2014 call to the Hotline, Wilson has established the second element of a prima facie case of disability retaliation.

Lastly, the Court concludes that Wilson has established a causal connection between his protected activity and Textron's adverse employment action. Wilson has shown that his protected activity occurred before Textron's adverse employment action and that Textron knew of his disability discrimination complaints at the time it decided to place him on medical leave. By alleging this sequence of events in conjunction with Textron's knowledge of Wilson's complaint, Wilson has sufficiently established a causal connection between his protected activity and the adverse employment action. As a result, Wilson has established a prima facie case for disability discrimination.

## 2.    *Nonretaliatory Reason*

At the second phase of the *McDonnell Douglas* analysis, the burden now shifts to Textron. Textron proffers the following nonretaliatory reason for placing Wilson on medical leave: its process to evaluate Wilson's disability and consider potential accommodations occurred after Wilson's complaint to the Hotline. Rather than insinuate a retaliatory connection between Wilson's complaint and Textron's eventual action, Textron's evaluation process indicates that it attempted to alleviate Wilson's condition and rectify his complaints. The process included at least six separate instances where Textron's representatives either visited Wilson's job site, assessed his physical condition, or met to consider reasonable accommodations. This process lasted over five months and included input from multiple Textron representatives across various departments. The uncontroverted facts show that Textron placed Wilson on medical leave only after determining

that there were no other reasonable accommodations for his disability. The Court concludes that Textron has met its burden to prove that it had legitimate, nonretaliatory reasons for placing Wilson on medical leave.

*3.      Pretext*

Moving on to the final stage of the *McDonnell Douglas* analysis, the Court concludes that Wilson has failed to meet his burden to prove that Textron's proffered nonretaliatory reasons are pretextual. Nothing in the record indicates that Textron's thorough evaluative process was undertaken with the pretext of nonretaliation. The simple fact that Textron's decision to place Wilson on medical leave occurred after Wilson's disability discrimination complaint does not give the Court enough reason to believe that Textron's decision was pretextual. Other than this chronological sequence and attenuated temporal proximity, Wilson provides no evidence why Textron's nonretaliatory reason is pretextual. As a result, Wilson has failed to carry the ultimate burden at the final stage of the *McDonnell Douglas* analysis and the Court therefore grants summary judgment on Wilson's disability retaliation claim.

## IV.      Conclusion

The Court concludes that Wilson has failed to establish a prima facie case for race or disability discrimination. Wilson likewise fails to establish a prima facie case for race retaliation. Although Wilson has established a prima facie case for disability retaliation, he has failed to carry his burden to show that Textron's legitimate, nonretaliatory reasons are pretextual. As a result, the Court grants summary judgment.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (Doc. 33) is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendant's Motion to Compel (Doc. 42) is **DENIED AS MOOT**.

**IT IS SO ORDERED.**

This case is closed.

Dated this 11th day of July, 2019.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE